Ivan C. McLEOD, Regional Director of the Second Region of the National Labor Relations Board, for and on behalf of the NATIONAL LABOR RELATIONS BOARD, Petitioner,

v.

LOCAL 378, AMALGAMATED MEAT CUTTERS AND BUTCHER WORKMEN OF NORTH AMERICA, AFL-CIO, Respondent.

No. 64-C-1193.

United States District Court
E. D. New York.
Dec. 30, 1964.

Carl G. Coben, New York City, for petitioner.

John J. Sheehan, New York City, for respondent.

Reavis & McGrath, New York City, for Waldbaum, Inc.; James P. Durante, New York City, of counsel.

BARTELS, District Judge.

This is a proceeding instituted by the petitioner, Regional Director of the Second Region of the National Labor Relations Board ("Board"), pursuant to Section 10(*l*) of the National Labor Relations Act, as amended ("the Act"), for a temporary injunction pending the final disposition of the matters involved pending before the Board on the ground that he has reasonable cause to believe [1] that the respondent, Local 378, Amalgamated Meat Cutters and Butcher Workmen of North America, AFL–CIO ("Local 378"), is engaging in unfair labor practices within the meaning of Section 8(b)(7)(A) of the Act [2] which proscribes certain organizational and recognition picketing.

I

The charge was filed by Waldbaum, Inc., which is engaged in the operation of retail supermarkets in the New York metropolitan area with its principal place of business in Garden City, New York, and admittedly engaged in commerce within the meaning of the Act. Local 378 is a labor organization, which is not currently certified as a representative of any of Waldbaum's employees. But Waldbaum and Local 338, Retail, Wholesale and Chain Store Food Employees Union, AFL–CIO ("Local 338"), are parties to a collective bargaining agreement expiring in September, 1965, by the terms of which Waldbaum recognizes Local 338 as the collective bargaining representative of Waldbaum's employees including those employed at its Brooklyn warehouse which was used for the receipt, storage and delivery of grocery and dairy products. In October, 1964, Wald-

---

[1] In this situation the duty of the Court is to ascertain only whether the Regional Director had reasonable cause to believe that the Act has been violated, not to decide whether there has been such a violation of the Act. Madden v. International Organization, etc., 7 Cir. 1958, 259 F.2d 312, cert. denied, 358 U.S. 909, 79 S.Ct. 236, 3 L.Ed.2d 229.

[2] This section provides in part as follows: "Sec. 8. * * *
"(b) It shall be an unfair labor practice for a labor organization or its agents—
* * * * *
"(7) to picket or cause to be picketed, or threaten to picket or cause to be pick-

eted, any employer where an object thereof is forcing or requiring an employer to recognize or bargain with a labor organization as the representative of his employees, or forcing or requiring the employees of an employer to accept or select such labor organization as their collective bargaining representative, unless such labor organization is currently certified as the representative of such employees:
"(A) where the employer has lawfully recognized in accordance with this Act any other labor organization and a question concerning representation may not appropriately be raised under Section 9(c) of this Act, * * *".

baum opened a warehouse in Garden City, Long Island, and relocated practically all of its Brooklyn warehouse operations to its Garden City warehouse, leaving only the dairy operation in Brooklyn. Forty-five (45) of the fifty (50) employees employed at the Brooklyn warehouse began working at the Garden City warehouse and by mutual consent of Waldbaum and Local 338, the collective bargaining agreement, above described, was made applicable to all of the employees at said Garden City warehouse.

Prior to November 27, 1964, Emerald Packing Corp. ("Emerald"), a wholly owned subsidiary of Waldbaum, was engaged in Manhattan in buying, cutting, selling and storing meat products including those received and stored on behalf of Waldbaum for its retail supermarkets. Emerald, which was located at 2284 12th Avenue, New York, sold approximately 40% of its meat products to outside purchasers, and employed approximately 23 employees who were represented by Local 174, Amalgamated Meat Cutters and Butcher Workmen of North America, AFL–CIO ("Local 174"), a sister local of Local 378. On November 13, 1964, Emerald notified Local 174 that it was terminating its business operations in Manhattan and accordingly on November 24, 1964 did terminate such operations and ceased doing business. Local 174 interposed no objection to the termination of Emerald's business operations in Manhattan and subsequently informed a vice-president of Waldbaum that practically all of its members had obtained jobs elsewhere. Thereafter Waldbaum no longer cut carcasses or sold meat wholesale to others but limited its meat operations to the purchase of cuts necessary for its stores and used the Garden City warehouse for storage of such meat products so purchased. Waldbaum's meat operations consisted of buying meat already cut in smaller parts and storing the same in a separate section of the Garden City warehouse devoted to the storing of meat and dairy products. This section represented 15% of the total warehouse area. In the new operations in Garden City approximately four men, including a supervisor and an assistant supervisor, formerly employed by Emerald and formerly members of Local 174, were employed. Two of Emerald's former employees apparently desired such employment under the terms of the old Local 174 contract but did not file applications therefor. According to Aaron Freedman, vice-president of Waldbaum, Inc., the remainder of Emerald's former employees did not seek to be so employed at Garden City.

Immediately after termination of Emerald's operations in Manhattan, Local 378 picketed the warehouse in Garden City and also Waldbaum's retail stores at Jericho, Seaford, East Meadows, New Hyde Park and Eastchester (Westchester), claiming that Waldbaum's employees were locked out. This assertion was made upon the theory that the labor contract between Emerald and Local 174 still continued in effect and was binding upon their respective successors; that Waldbaum was the successor to Emerald and that Local 378 was the successor to Local 174 and the heir to all the members of Local 174. While Waldbaum was the successor to the rights and obligations of Emerald in liquidation, it does not follow that Emerald had any obligation under its labor contract with Local 174 to which Waldbaum succeeded as obligor. Whether Local 378 is the successor to Local 174 presents an entirely different question. It is true that the jurisdiction of Local 174 does not include Long Island, whereas the jurisdiction of Local 378 does include Long Island but not Manhattan. However, jurisdiction is not the sole test. Both locals are members of the same international union but it does not follow from this fact that Local 378 is the successor to Local 174, nor that there are any rights of Local 174 under the labor contract with Emerald to which Local 378 automatically succeeded.

Local 378 claims that Waldbaum is attempting to evade the obligations of Local 174 contract by treating Local 338 as a representative of all of the workers including meat handlers at the Garden

City plant and thus pays a lower rate of wages to them under the Local 338 contract than required by the Local 174 contract. Former employees of Emerald, now employed at the Garden City warehouse, became members of Local 338. No former employees of Emerald who were members of Local 174 and are now employed at Garden City, have given Local 378 an authorization card or the right to a check-off and in no wise have signified their approval of any change in affiliation to Local 378. Moreover, Local 174 never delivered any transfers of membership to Local 378. There is no indication that any employees of Waldbaum now working in the Garden City warehouse, desire Local 378 as their bargaining representative.

Moreover, on December 2, 1964, Local 378 filed an unfair labor charge against Waldbaum alleging "the Employer refused to recognize and still refuses to recognize and bargain with the Union as the representative of meat warehouse employees in its employ." On December 21, 1964, the Board refused to issue a complaint in the matter upon the ground that "There is no basis for any claim that you were designated by a majority of the employees in any appropriate unit of employees at the Company's Garden City warehouse, the facility involved herein, nor under the circumstances of this case is there merit to your claim to the status of collective bargaining representative as successor to Local 174, Amalgamated Meat Cutters or in any other capacity."

## II

■ Upon this state of the record the Court concludes that this is not a runaway shop case where the employer has transferred the same operations from one situs to another, so that in effect it is simply relocating the same old operation. See N. L. R. B. v. Winchester Electronics, Incorporated, 2 Cir. 1961, 295 F.2d 288. Rather this is a case where the employer has ceased and terminated the old type of operation theretofore engaged in by it at its former location. Cf., N. L. R. B. v. Houston Chronicle Pub. Co., 5 Cir.

1954, 211 F.2d 848. No longer does the employer buy large carcasses, cut the same in small parts and sell forty percent. (40%) to outside purchasers and keep and store the remainder for its stores. The character of the operations at Garden City is quite different and the storage of the smaller cuts of meat now purchased by Waldbaum constitutes the same functional activity as the storage of groceries. Both operations are closely integrated and the storage of meat is a normal accretion to the storage of groceries. A case involving an accretion of a similar nature appears in the matter of Simmons Company, 126 N L R B 656 (1960), where the Board classified mattress manufacturing in the same category as home furniture manufacturing, stating: "As heretofore indicated, both operations are closely integrated and there clearly exists a community of interest between employees in the two departments. Nor does the fact that a little more machine work is required in mattress manufacturing than in upholstery making, persuade us that the overall function has been sufficiently changed to classify the bedroom operation as a new undertaking." (pp. 658–659) Since the work of the former employees of Emerald at Garden City involved the same functional activities as the work of the members of Local 338, it was proper that the latter should represent them.

■ There is no merit in the contention that Local 378 became the automatic successor to Local 174 as the representative of the former employees of Emerald. Union members are not pawns to be transferred from one local to another without their consent or in fact without even the consent of the old local. Cf., Graphic Finishers, Inc., 119 NLRB 374, at 377 (1957).

■ The evidence reveals and it was substantiated by the complaint filed with the Board by Local 378, that the latter union seeks to force Waldbaum as an employer to recognize it or to bargain with it as the representative of those employees of Waldbaum engaged in meat

storage, if not all of the other employees working at the Garden City warehouse. As also established by the record, another union (Local 338) has already been lawfully recognized by Waldbaum as the representative of all the employees working at the Garden City warehouse under a contract which expires in September, 1965. Under the circumstances, Local 378 is not only proscribed from picketing under Section 8(b) (7) (A) of the Act but is prohibited by the contract-bar rule of the Board from filing a petition for an election until the termination of the exisiting contract with Local 338 in September, 1965. See General Cable Corporation, 139 NLRB 1123 (1962).

The Court finds that the Board had reasonable cause to believe that the respondent has engaged in and is engaging in an unfair labor practice within the meaning of Section 8(b) (7) (A) of the Act and accordingly concludes that a temporary injuction should be issued pursuant to Section 10(*l*) of the Act.

Findings of Fact and Conclusions of Law have been signed in accordance with the foregoing.